Dena C. Sharp (SBN 245869)
Scott Grzenczyk (SBN 279309)
Kyle Quackenbush (SBN 322401)
Jordan N. Isern (SBN 343159)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
kquackenbush@girardsharp.com
jisern@girardsharp.com

*Attorneys for Plaintiff and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGEANTS BENEVOLENT ASSOCIATION HEALTH & WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA PHARMACEUTICALS U.S.A., INC., TAKEDA PHARMACEUTICALS AMERICA, INC., TWI PHARMACEUTICALS INC., and TWI PHARMACEUTICALS USA, INC.<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF STATE ANTITRUST AND CONSUMER PROTECTION LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

1

**TABLE OF CONTENTS**

I.      INTRODUCTION .............................................................................................. 1

II.     PARTIES ........................................................................................................... 3

III.    JURISDICTION AND VENUE ....................................................................... 4

IV.     DIVISIONAL ASSIGNMENT ........................................................................ 5

V.      REGULATORY FRAMEWORK .................................................................... 6

        A.      The Regulatory Structure for Approval and Substitution of Generic Drugs ................... 6

                1.      The Hatch-Waxman Amendments ........................................................ 7

                2.      Regulatory Exclusivities for New Drugs ............................................. 8

                3.      Abbreviated New Drug Applications and Paragraph IV Certifications ................ 9

                4.      The First-Filer's 180-Day Exclusivity Period ...................................... 9

                5.      Patents are Subject to Judicial and Administrative Scrutiny ............... 11

        B.      The Competitive Effects of AB-Rated Generic and Authorized Generic
                Competition ....................................................................................................... 12

                1.      The first AB-Rated Generic is Priced Below the Brand ..................... 14

                2.      Later Generics Drive Prices Down Further ........................................ 14

                3.      Authorized Generics, Like Other Generics, Compete on Price .......... 15

        C.      Manipulation of the Regulatory Structure to Impair Competition .................... 17

        D.      No-AG Agreements Provide a Means for Brand and Generic Manufacturers to
                Share the Gains from Conspiring ....................................................................... 19

VI.     FACTUAL ALLEGATIONS ......................................................................... 23

        A.      Takeda's Development and Approval of Dexilant ......................................... 23

        B.      Takeda's Patents, Orange Book Listings, and ANDA Filings by Generic
                Manufacturers .................................................................................................... 24

        C.      Takeda's Infringement Suits Against Generic Manufacturers and 2013 Trial
                Rulings ............................................................................................................... 27

                1.      Litigation Concerning the '282, '755, '058, '276, '971, and '668 Patents .......... 27

i

CLASS ACTION COMPLAINT

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.  Litigation Concerning the '158 and '187 Patents ................................................. 30

D.  Takeda Resolves Each of Its Dexilant Patent Cases After the Initial Trial .................... 33

E.  The Settlement Between Takeda and TWi Included an Unlawful "reverse payment" and Market Allocation Agreement ........................................................ 34

F.  Takeda Entered Into Other Alleged Improper Agreements with Competitors During this Same Time Period ........................................................................ 37

G.  If Takeda Retained the Right to Launch an AG or Received Royalties from TWi, such Facts Would Not Change the Illegality of Defendants' Agreement ....................... 38

H.  In the Absence of Defendants' Agreement, Two Generics Would Have Been Available, at a Much Lower Price Point, by Approximately June 15, 2020 or Earlier ................................................................................................ 38

VII.  MARKET POWER AND DEFINITION ................................................................ 40

VIII.  ANTITRUST IMPACT .................................................................................... 42

IX.  INTERSTATE AND INTRASTATE COMMERCE .................................................. 43

X.  CLASS ACTION ALLEGATIONS ...................................................................... 44

XI.  CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT .............................. 47

XII.  CLAIMS FOR RELIEF .................................................................................... 48

XIII.  DEMAND FOR JUDGMENT ............................................................................ 56

XIV.  JURY DEMAND ........................................................................................... 57

CLASS ACTION COMPLAINT

Plaintiff Sergeants Benevolent Association Health & Welfare Fund ("SBA") brings this lawsuit, on behalf of itself and all others similarly situated, against Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., Takeda Pharmaceuticals America, Inc. (collectively, "Takeda") and TWi Pharmaceuticals, Inc., and TWi Pharmaceuticals USA, Inc. (collectively, "TWi") (together "Defendants"). The allegations contained herein are based on personal knowledge as to Plaintiff and upon information and belief as to all other topics.

## I.    INTRODUCTION

1.    This civil antitrust action seeks damages to address Defendants' anticompetitive horizontal conspiracy to delay generic competition for the prescription drug Dexilant (active ingredient: dexlansoprazole). Defendants, who are rival pharmaceutical companies, engaged in a coordinated effort to limit competition in the market for Dexilant and its generic versions through a "reverse payment" and market allocation agreement.

2.    Dexilant is used to treat erosive esophagitis and symptoms of gastroesophageal reflux disease ("GERD"). Since 2009, Takeda has marketed branded Dexilant in the U.S., earning billions in revenue. Starting in 2010, generic pharmaceutical companies began submitting applications to the U.S. Food and Drug Administration ("FDA") to obtain approval to sell generic versions of Dexilant to compete with Takeda's branded product. Takeda initiated legal action to prevent this competition in the Northern District of California, asserting that these generic companies would infringe on one or more of its patents for the drug. Takeda and TWi consented to the district court's personal jurisdiction.

3.    Takeda's lawsuits against generic manufacturers TWi, Par, and Impax were combined and went to trial in June 2013. The presiding judge, the Honorable Joseph Spero, ruled in favor of the generic manufacturers on certain patents while siding with Takeda on one. TWi was found to have infringed a single patent—United States Patent No. 7,737,282 (the " '282 patent")—which was set to expire on June 15, 2020.

4.    TWi had strong grounds to have its trial victories upheld and its loss regarding the '282 patent overturned at the U.S. Court of Appeals for the Federal Circuit. During oral arguments in March 2015, one of the judges on the panel suggested that Judge Spero had made a reversible error by concluding that the '282 patent was valid and not anticipated or made obvious by prior art.

5.      Even if all trial court decisions were upheld, the '282 patent was still set to expire in June 2020. Free from the original patent litigation, TWi faced only a belated challenge on two later-filed and later-expiring patents—U.S. Patent Nos. 8,461,187 (the " '187 patent") and 8,173,158 (the " '158 patent")—that Takeda only filed right before trial on the '282 patent that it would lose.

6.      On April 27, 2015, shortly after the oral arguments on the '282 patent before the Federal Circuit but before the appeals were resolved and after an order granting in part and denying in part TWi and Takeda's motions for summary judgment on the '187 and '158 patents, Takeda settled its claims against TWi. Instead of competing, Takeda and TWi opted to reach an agreement to unlawfully extend Takeda's monopoly and provide TWi with a monopoly of its own. Specifically, Takeda and TWi agreed that TWi would delay launching a generic version of Dexilant until January 2022, approximately 18 months after the expiration of the '282 patent, thereby preventing TWi from entering the market. In exchange for TWi agreeing to refrain from competing with branded Dexilant, the agreement provided substantial value to TWi in at least two ways.

7.      First, Takeda paid TWi $9.5 million in cash. Second, Takeda offered TWi the option to launch either an authorized generic ("AG") version of Dexilant or its own Abbreviated New Drug Application ("ANDA") product, knowing that TWi would choose the former to ensure only one generic version of the drug would be available, rather than two. Essentially, Takeda granted TWi a monopoly on the generic sales of the drug and agreed not to compete with TWi with Takeda's own generic product when TWi was finally allowed to enter the market in 2022.

8.      In compliance with this unlawful agreement, TWi began selling the AG Dexilant product around January 1, 2022, and Takeda, as per their agreement, allowed TWi to be the sole generic seller for nearly a year. This arrangement was advantageous for both Defendants. Takeda benefited by extending its monopoly until 2022, enabling it to avoid generic competition and maintain high prices for branded Dexilant during that period. TWi benefited by being able to sell generic Dexilant without competition from other generics for almost a year when it finally entered the market.

9.      Conversely, this agreement was detrimental to Plaintiff and payers of both branded and generic Dexilant, who faced: (a) inflated prices because they had to purchase branded Dexilant when a less expensive generic option would have been available earlier in mid-2020; (b) inflated prices on their

generic Dexilant purchases after TWi's AG Dexilant entered the market in January 2022, as TWi could charge more for generic Dexilant than it would have been able to if it had not been the exclusive seller for nearly a year; and (c) inflated prices after other generics entered the market as a result of the delay in price decreases flowing from unrestricted competition.

10.    This lawsuit seeks to hold Takeda and TWi accountable for their unlawful actions, which have obstructed free and fair competition and caused significant financial harm to persons like Plaintiff and Class members that bear the brunt of costs for making Dexilant treatments available to patients.

## II.    PARTIES

11.    Plaintiff SBA is located in New York and was established for the purpose of providing benefits to thousands of retired New York City Police Department sergeants and their dependents. As a third-party payor of pharmaceutical claims for its members and their dependents, SBA is an end-payor for brand and generic Dexilant and was thereby injured as a result of Defendants' unlawful behavior. SBA indirectly paid for and/or provided reimbursement for brand and generic Dexilant during the Class Period (defined below) purchased in at least New York and Florida.

12.    Defendant Takeda Pharmaceutical Company Limited ("Takeda Japan") is a Japanese corporation having its global headquarters and a principal place of business at 1-1, Nihonbashi-Honcho 2-Chome, Chuo-ku, Tokyo 103-8668, Japan. Takeda Japan owns and controls Takeda Pharmaceuticals U.S.A., Inc., ("Takeda U.S.A.") and Takeda Pharmaceuticals America, Inc. ("Takeda America"). Takeda Japan, Takeda U.S.A., and Takeda America were all parties to the unlawful settlement agreement with TWi.

13.    Takeda U.S.A. and Takeda America's current principal place of business is at 95 Hayden Avenue, Lexington, Massachusetts 02421. Takeda has other operations in the United States located near Chicago, Illinois, and in San Diego, California. Takeda's office in San Diego is "home to [its] global research site focused on gastroenterology and neuroscience" that houses over 250 employees and includes four research platform groups: structural biology, early target discovery,

computational biology, and biologics.[1] Takeda notes that "The San Diego life sciences cluster, a major driver of the region's economy, is home to approximately 1,200 life sciences companies and 80 research institutes — an ecosystem Takeda is proud to be a part of."[2] Takeda also operates a vertically integrated bioprocessing plant in Thousand Oaks, California, with over 25 years of manufacturing experience.[3] In 2021, Takeda invested $126 million to expand this facility, adding a new 15,000-square-foot manufacturing area and enhancing an existing 14,000-square-foot space.[4] And in June 2024, Takeda announced a $230 million expansion of its Los Angeles manufacturing facility located at 4501 Colorado Blvd., near Glendale, which aims to increase the production capacity and is expected to create over 125 new jobs.[5]

14.    Defendant TWi Pharmaceuticals, Inc. ("TWi Pharmaceuticals") is a Taiwanese corporation having a principal place of business at 3F., No. 41, Ln. 221, Gangqian Rd., Neihu Dist., Taipei City 114, Taiwan (R.O.C.). TWi Pharmaceuticals owns and controls TWi Pharmaceuticals USA, Inc. ("TWi USA"), with its principal place of business located at 115 West Century Road, Suite 135, Paramus, New Jersey 07652.

15.    All of the Defendants' wrongful actions described in this complaint are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

## III.    JURISDICTION AND VENUE

16.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one

---

[1] https://www.takeda.com/en-us/what-we-do/research-and-development/; https://www.takeda.com/en-us/newsroom/news-releases/2019/takeda-opens-new-global-research-center-in-san-diego/
[2] *Id.*
[3] https://jobs.takeda.com/thousandoaks
[4] https://www.fiercepharma.com/manufacturing/takeda-lays-out-126m-to-tap-robotics-virtual-reality-and-more-at-california
[5] https://www.takeda.com/en-us/newsroom/news-releases/2024/expanding-production-capacity-for-PDT-at-LA-manufacturing-site/

member of the putative class is a citizen of a state different from that of one of the Defendants. The Court also has jurisdiction over the claims under various state laws, as provided in both 28 U.S.C. § 1332(d) and 28 U.S.C. § 1367(a).

17.    This action seeks to recover treble damages, interest, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class resulting from the Takeda Defendants' monopolization and from all Defendants' conspiracy to restrain trade in the United States market for Dexilant and its generic equivalents.

18.    Venue is appropriate within this district as Defendants transact business here. Venue is also appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district. Defendants' anticompetitive reverse payment agreement was entered into in this district following patent litigation in this district.

19.    The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in California and in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in California and in this district.

20.    As further evidence of personal jurisdiction, Takeda sued TWi two times for patent infringement in this district concerning the underlying patents at issue in this litigation, and neither Defendant contested personal jurisdiction. *Takeda Pharmaceuticals Co. Ltd., et al. v. TWi Pharmaceuticals, Inc.*, No. 3:11-cv-1609 (N.D. Cal.); *Takeda Pharmaceuticals Co. Ltd., et al. v. TWi Pharmaceuticals, Inc.*, No. 5:13-cv-2420 (N.D. Cal.).

## IV.    DIVISIONAL ASSIGNMENT

21.    Pursuant to Northern District of California Local Rules 3-1(d) and 3-5(b), this action is filed in the San Francisco Division of the Northern District of California, where the underlying patent litigation described herein took place, where Defendants transact significant business, and where three related cases—*Walgreen Co., et al. v. Takeda Pharmaceutical Co., Ltd., et al.*, No. 3:25-cv-02785-JSC (N.D. Cal.); *KPH Healthcare Services v. Takeda Pharmaceutical Co., Ltd., et al.*, No. 3:25-cv-02966-

JSC (N.D. Cal.); and *SuperValu, Inc. v. Takeda Pharmaceutical Co., Ltd., et al.*, No. 3:25-cv-03189-RFL (N.D. Cal.)——are pending.

## V.    REGULATORY FRAMEWORK

### A.    The Regulatory Structure for Approval and Substitution of Generic Drugs

22.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"),[6] manufacturers that create a new drug must obtain approval from the FDA to sell the product by filing a New Drug Application ("NDA").[7] An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[8]

23.    When the FDA approves a brand manufacturer's NDA, the manufacturer may list in *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book") patents that claim the drug or a method of using the drug, and that could reasonably be enforced against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents.[9] The manufacturer may list in the Orange Book within 30 days of issuance any patents issued after the FDA approves the NDA.[10]

24.    The FDA relies completely on the brand manufacturer's truthfulness in submitting patents for listing, as it does not have the resources or authority to verify the validity or relevance of the manufacturer's patents. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

25.    As described below, when a patent is (properly) listed in the Orange Book, a brand manufacturer may sue a generic company for infringing that patent before the generic product is sold. If it does, the FDA cannot approve the generic manufacturer's drug application for a period of two and a half years. Here, it was undisputed that Takeda's '282 patent was never listed in the Orange Book, and TWi raised that as one of the issues on its appeal to the Federal Circuit.

---

[6] Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified as amended in 21 U.S.C. § 301 et seq.).
[7] 21 U.S.C. §§ 301-392.
[8] 21 U.S.C. §§ 355(a), (b).
[9] For example, patents covering processes for making drug products may not be listed in the Orange Book.
[10] 21 U.S.C. § 355(b)(1), (c)(2).

CLASS ACTION COMPLAINT

### 1.  The Hatch-Waxman Amendments

26.  The Hatch-Waxman Amendments, enacted in 1984, simplified regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file NDAs.[11] A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA and must further show that the generic contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug and that it is bioequivalent, i.e., absorbed at the same rate and to the same extent as the brand. The FDA assigns generics that meet these criteria relative to their brand counterparts an "AB" rating.

27.  The FDCA and Hatch-Waxman Amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic would be present in a patient's blood to the same extent and for the same amount of time as the brand counterpart.[12]

28.  Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

29.  The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historically high profit margins for brand pharmaceutical manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenues for brands and generics totaled $21.6 billion; by 2013, total prescription

---

[11] *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355).
[12] 21 U.S.C. § 355(j)(8)(B).

CLASS ACTION COMPLAINT

drug revenues had climbed to more than $329.2 billion, with generics accounting for 86% of prescriptions.[13] Generics are dispensed about 97% of the time when a generic form is available.[14]

### 2. Regulatory Exclusivities for New Drugs

30.    To promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman Amendments also provided for exclusivities, or exclusive marketing rights, for new drugs. These exclusivities are granted by the FDA upon approval of a drug if statutory requirements are met. These exclusivities are listed in the Orange Book, along with any applicable patents, and can run concurrently with the listed patents.

31.    One such exclusivity, New Chemical Entity ("NCE") exclusivity, applies to products containing chemical entities never previously approved by FDA either alone or in combination. If a product receives NCE exclusivity, the FDA may not accept for review any ANDA for a drug containing the same active moiety for five years from the date of the NDA's approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an application may be submitted after four years.[15]

32.    A drug product may also receive a three-year period of exclusivity if its sponsor submits a supplemental application that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that were essential to approval of the supplemental application. If this exclusivity is granted, the FDA may not approve an ANDA for that drug for three years from the date on which the supplemental application is approved.[16]

33.    Regulatory exclusivities are not always absolute bars to generic entry. For example, some can be overcome by carving out information in the label or for other reasons.[17]

---

[13] *See* IMS Institute for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013* 30, 51 (2014), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/IMSMedicine%20use%20and%20shifting%20cost%20of%20healthcare.pdf.

[14] IQVIA Institute for Human Data Science, *The Use of Medicines in the U.S.: Spending and Usage Trends and Outlook to 2025* (2021), p. 3.

[15] 21 U.S.C. § 355(j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).

[16] 21 U.S.C. § 355(j)(5)(F)(iv); 21 C.F.R. § 314.108(b)(2)(5).

[17] *See, e.g.*, 21 C.F.R. §§ 314.94(a)(8)(iv), 314.127(a)(7); 21 U.S.C. § 355a(o).

CLASS ACTION COMPLAINT

### 3.      Abbreviated New Drug Applications and Paragraph IV Certifications

34.      To obtain FDA approval of an ANDA, a manufacturer must certify that the generic will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

a) That no patent for the brand has been filed with the FDA (a "paragraph I certification");

b) That the patent for the brand has expired (a "paragraph II certification");

c) That the patent for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "paragraph III certification"); or

d) That the patent for the brand is invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").[18]

35.      If a generic manufacturer files a paragraph IV certification, a brand manufacturer can sue the ANDA applicant for patent infringement. If the brand manufacturer does so within 45 days of receiving notification of the paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (i) the passage of two-and-a-half years (thirty months), or (ii) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.[19] Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product (i.e., grant final approval). The FDA may grant an ANDA tentative approval when it determines that the ANDA is ready for final approval but for the 30-month stay.

### 4.      The First-Filer's 180-Day Exclusivity Period

36.      Generics may be classified as (i) first-filer generics, (ii) later generic filers, or (iii) authorized generics.

---

[18] 21 U.S.C. § 355(j)(2)(A)(vii).
[19] 21 U.S.C. § 355(j)(5)(B)(iii). This period is commonly called a "30-month Hatch-Waxman stay" or "30-month stay." The brand/patent holder can choose to sue the generic after 45 days, including waiting until the generic has launched its product, but, in that event, the brand cannot take advantage of the 30-month stay of FDA approval, and must instead satisfy the showing required to obtain a preliminary injunction to prevent the generic launch.

CLASS ACTION COMPLAINT

37.     To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the first paragraph IV generic manufacturer ANDA filer ("first-filer") a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug.[20] That is, when a first-filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand are either invalid or not infringed by the generic, the FDA cannot approve a later generic manufacturer's ANDA until that first generic has been on the market for 180 days (or if the first-filer loses 180-day exclusivity).

38.     The 180-day window is often referred to as the first-filer's six-month or 180-day "exclusivity"; this is a bit of a misnomer because a brand manufacturer (such as Takeda) can launch an AG at any time, manufacturing its AG in accordance with its approved NDA for the branded product but selling through a third party at a lower price point. An authorized generic (or "AG") is the brand product, manufactured by the brand company, with a generic label. An AG, then, is chemically identical to the brand drug but is sold as a generic, typically through either the brand manufacturer's subsidiary (if it has one) or through a third-party distributor. Brand manufacturers frequently launch AGs in response to generic entry to recoup some of the sales they would otherwise lose. Nothing prohibits a brand company from launching its own AG while also licensing a third-party to distribute and sell an AG as well.

39.     The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first-filer.[21] This is particularly true when the brand company does not launch its own, competing AG.

40.     A first-filer that informs the FDA it intends to wait until all Orange Book-listed patents expire before marketing its generic does not get a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents or to invent around such patents by creating non-infringing generics.

---

[20] 21 U.S.C. § 355(j)(5)(B)(iv), (D).

[21] *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 144 (2013) (quoting C. Scott Hemphill, Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem, 81 N.Y.U. L. REV. 1553, 1579 (2006)).

41.     A first-filer can forfeit its 180-day exclusivity by failing to obtain tentative approval from the FDA for its ANDA within 30 months of filing its ANDA.[22] A first-filer can also forfeit exclusivity as to any later filers when: (a) a later filer receives a final judgment that their proposed ANDA product either does not infringe the patents certified by the first filer or that such patents are invalid; and (b) the first filer fails to market before 75 days have passed since such judgment from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken.[23]

### 5.     Patents are Subject to Judicial and Administrative Scrutiny

42.     A patent may be valid or invalid, infringed or not infringed, and enforceable or unenforceable. Simply owning a patent does not necessarily mean that the patent owner will ultimately be able to use the patent to exclude others. Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the United States Patent and Trademark Office ("PTO"), court decision, or jury verdict.

43.     A patent holder at all times bears the burden of proving infringement. One way that a generic manufacturer can prevail in patent infringement litigation is to show that its product does not infringe the patent (and/or that the patent holder cannot meet its burden to prove infringement). Another is to show that the patent is invalid or unenforceable.

44.     A patent is invalid or unenforceable when, among other things: (i) the disclosed invention is obvious in light of earlier prior art; (ii) when an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material or submits materially false information to the PTO during prosecution; and/or (iii) when a later acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).[24]

---

[22] 21 U.S.C. § 355(j)(5)(D)(i)(IV).

[23] 21 U.S.C. 355(j)(5)(D)(i)(I)(bb)(AA).

[24] Other actions by the patentee, but less relevant here, can invalidate or otherwise render a patent unenforceable. While not an exhaustive list, such actions include failing to name the correct inventors, failing to adequately describe and claim the invention, and failing to pay the required maintenance fees to the PTO. Licenses and ownership transfers can render a patent unenforceable against a particular infringer, and laches and estoppel can apply when a patent holder delays bringing suit against a known infringer for too long. Lastly, the patent can be unenforceable because its term has expired.

45.     In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of: (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent; and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

46.     As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[25] An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[26]

**B.     The Competitive Effects of AB-Rated Generic and Authorized Generic Competition**

47.     Generic versions of brand-name pharmaceutical drugs contain the same active ingredient(s) as the brand-name drug and are determined by the FDA to be just as safe and effective as their brand counterparts. The price is the only material difference between generics and their corresponding brand versions. Because generics are essentially commodities that cannot be therapeutically differentiated, price is the primary basis for competition between a branded product and its generic version or between generic versions. Typically, generics are 50% to 80% (or more) less expensive than their brand counterparts when multiple generic competitors are on the market for a given brand. Consequently, the launch of a generic usually results in significant cost savings for all persons that pay for prescription drugs.

48.     Since the passage of the Hatch-Waxman Amendments, every state has adopted drug substitution laws that either require or permit pharmacies to substitute AB-rated generic equivalents for

---

[25] FTC, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* vi-vii (2002), https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf.

[26] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 TEX. L. REV. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

CLASS ACTION COMPLAINT

brand prescriptions (unless the prescribing physician specifically directs that substitution is not permitted). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing. Once a generic hits the market, it quickly captures sales of the corresponding brand drug, often 80% or more of the market, within the first six months after entry. According to the IQVIA Institute—the leading provider of data in the healthcare sector—since 2013, consumers have purchased the generic version of drugs 97% of the time when a generic is available.[27] The Federal Trade Commission ("FTC") has found that, on average, within a year of generic entry, prices have dropped by 85%.[28] As a result, competition from generics is viewed by brand manufacturers as a serious threat to their bottom line.

49.     On the other hand, generic competition greatly benefits payers of prescription drugs because they can (i) purchase generic versions of the drug at substantially lower prices and/or (ii) purchase the brand at a reduced price.

50.     Until a generic version of the brand drug enters the market, however, there is no bioequivalent drug to substitute for and compete with the brand, and the brand manufacturer can, therefore, continue to profitably charge supracompetitive prices. Brand manufacturers are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to any means possible—including illegal means—to delay or prevent generic competition.

---

[27] IQVIA Institute for Human Data Science, *The Use of Medicines in the U.S.: Spending and Usage Trends and Outlook to 2025* (2021)
[28] FTC, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* 8 (2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf ("FTC Pay-for-Delay Study"). Since the publication of this study, generic prices relative to brand prices have continued to decline further.

CLASS ACTION COMPLAINT

### 1.    The first AB-Rated Generic is Priced Below the Brand

51.    Experience and economic research show that the first generic manufacturer to market its product prices the generic product below the prices of its brand counterpart.[29] Every state either requires or permits that a prescription written for the brand be filled with an AB-rated generic. Thus, the first generic manufacturer almost always captures a large share of sales from the brand. At the same time, there is a reduction in the average price paid for the drug at issue (brand and AB-rated generic combined).

52.    During the 180-day exclusivity period, the first-filer is the only ANDA-approved generic manufacturer on the market (though the brand's AG can be, and often is, on the market during the 180-day exclusivity period). In the absence of competition from other generics, during the 180-day exclusivity period, a first-filer generic manufacturer generally makes about 80% of all of the profits that it will ever make on the product.

### 2.    Later Generics Drive Prices Down Further

53.    Once generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[30]

54.    According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two. In that situation, there are two commodities that compete on price.

55.    In a report by the FTC issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months (this percentage erosion of brand sales

---

[29] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* ii-iii, vi, 34 (2011), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf ("FTC 2011 AG Study"); FTC Pay-for-Delay Study at 1.

[30] *See, e.g.*, Tracy Regan, Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market, 26 INT'L J. INDUS. ORG. 930 (2008); Richard G. Frank, The Ongoing Regulation of Generic Drugs, 357 NEW ENG. J. MED. 1993 (2007); Patricia M. Danzon & Li-Wei Chao, Does Regulation Drive Out Competition in Pharmaceutical Markets?, 43 J.L. & ECON. 311 (2000).

14

CLASS ACTION COMPLAINT

holds regardless of the number of generic entrants).[31] In the end, the brand manufacturer's sales decline to a small fraction of their level before generic entry. This is so because, "[a]lthough generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies."[32]

### 3. Authorized Generics, Like Other Generics, Compete on Price

56. As noted above, the 180-day exclusivity does not bar the entry of authorized generics; the statutory scheme does not prevent a brand manufacturer from marketing and selling (directly or indirectly) an AG at any time or from licensing another company to do so.

57. The FDA has found that allowing brand manufacturers to introduce AGs during the 180-day exclusivity period is consistent with the "fundamental objective of the Hatch-Waxman [A]mendments" to encourage competition and, as a result, "lower prices in the pharmaceutical market."[33] The FDA reasoned that if a brand releases an AG at a reduced price during the 180-day exclusivity period, "this might reasonably be expected to diminish the economic benefit" to the generic first-filer by increasing competition and causing the generic to "reduc[e] the substantial 'mark-up' [generics] can often apply during the [180-day] period."[34] Such competition, and the resulting price decreases, work to benefit drug purchasers.

58. Brand manufacturers recognize the significant economic advantages of releasing their AGs to compete with the first-filer generic during the 180-day exclusivity period. One study noted that "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[35]

---

[31] FTC 2011 AG Study at 66-67.
[32] See FDA, *What Are Generic Drugs?*, https://www.fda.gov/drugs/generic-drugs/what-are-generic-drugs (last updated Aug. 24, 2017).
[33] FDA Response to Mylan and Teva Citizen Petitions at 11-12, Docket Nos. FDA-2004-P-0400 (formerly 2004P-0075) and FDA-2004-P-0146 (formerly 2004P-0261) (July 2, 2004).
[34] *Id.* at 12.
[35] Kevin A. Hassett & Robert J. Shapiro, Sonecon, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals* 3 (2007), http://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf.

CLASS ACTION COMPLAINT

59.     Competition from an AG substantially reduces drug prices and the revenues of the first-filer generic (especially during the 180-day exclusivity period).

60.     A study analyzing three examples of AGs found that "[f]or all three products, authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[36]

61.     The FTC similarly found that AGs capture a significant portion of sales, reducing the first-filer generic's revenues by about 50% on average.[37] The first-filer generic makes much less money when it faces competition from an AG because: (i) the AG takes a large share of unit sales away from the first-filer; and (ii) the presence of the AG causes prices, particularly generic prices, to decrease.

62.     Authorized generics, therefore, are a significant source of competition. All drug industry participants recognize this. In 2006, the branded pharmaceuticals industry group known as PhRMA sponsored a study that concluded the presence of an authorized generic causes generic wholesale prices to be more than 15% lower compared to when there is no authorized generic.[38] Generic companies recognize it.[39] Brand companies recognize it.[40]

---

[36] Ernst R. Berndt et al., *Authorized Generic Drugs, Price Competition, and Consumers' Welfare*, 26 Health Affairs 790, 796 (2007).

[37] FTC 2011 AG Study at 139.

[38] IMS Consulting, *Assessment of Authorized Generics in the U.S.* (2006), http://208.106.226.207/downloads/IMSAuthorizedGenericsReport_6-22-06.pdf.

[39] One generic stated that "[d]ue to market share and pricing erosion at the hands of the authorized [generic], we estimate that the profits for the 'pure' generic during the exclusivity period could be reduced by approximately 60% in a typical scenario." *See* FTC 2011 AG Study at 81. Another generic manufacturer quantified the fiscal consequences of competing with an authorized generic and determined that the authorized generic reduced its first generic's revenues by *two-thirds*, or by approximately *$400 million*. Comment of Apotex Corp. in Support of Mylan Citizen Petition at 4, Docket No. 2004P-0075 (Mar. 24, 2004), https://web.archive.org/web/20041216115511/http://www.fda.gov/ohrms/dockets/dailys/04/apr04/040204/04P-0075-emc00001.pdf.

[40] Commenting on an FDA Citizen Petition by drug manufacturer Teva Pharmaceuticals, Pfizer stated: "Teva's petition [to prevent the launch of an authorized generic] is a *flagrant effort to stifle price competition* – to Teva's benefit and the public's detriment." Comment of Pfizer at 6-7, Docket No. 2004P-0261 (June 23, 2004), https://web.archive.org/web/20050601041653/http://www.fda.gov/ohrms/dockets/dailys/04/June04/062904/04p-0261-cr00001-01-vol2.pdf; Comment of Johnson & Johnson at 1, FDA Docket No. 2004P-0075 (May 11, 2004),

### C.    Manipulation of the Regulatory Structure to Impair Competition

63.    The brand manufacturer of a pharmaceutical product with no generic competition in the marketplace receives all the profits from all unit sales. In this circumstance, brand manufacturers can typically sell their drug for far more than the marginal cost of production, often generating profit margins of 80% or more while achieving hundreds of millions, or billions, of dollars in sales. The ability to achieve those kinds of profit margins is what economists refer to as market power.

64.    When a generic equivalent enters the market, however, it quickly captures 80% or more of the unit sales from the brand drug. When generic entry occurs, the brand manufacturer loses most of the unit sales; the generic manufacturer sells almost all of the units but at drastically reduced prices—delivering enormous savings to drug purchasers. And when multiple generics compete in the market, that competition drives prices down to near the marginal cost of production. This competition ends the brand manufacturer's market power and delivers enormous savings to drug purchasers. Competition converts what formerly were excess profits into purchaser savings.

65.    While brand manufacturers and first-filer generic manufacturers are typically marketplace competitors, they share a collective interest in preventing robust competition from other generic manufacturers—competition that severely depresses prices—from emerging. If the brand and first-filer generic work together to prevent or delay such competition, they can maintain the profit margins on all unit sales at 70% and split the resulting excess profits among themselves. In other words, by stifling competition, the brand manufacturer and first-filer generic manufacturer can maintain high prices, protect their profits, and split between themselves the enormous savings that increased generic competition would have delivered to drug purchasers.

66.    **Figure 1** compares the impact on a brand manufacturer's profits between (i) a situation where it settles a patent lawsuit on the merits (i.e., with only an agreed entry date and without a pay-off to the generic company); and (ii) a situation where it settles the lawsuit with a large, unjustified payment to the generic manufacturer. In the former situation, the agreed entry date for the generic is earlier, and the brand manufacturer's profits are thus greatly reduced. In the latter situation, the agreed entry date is later, and the brand manufacturer's profits increase significantly.

---

https://web.archive.org/web/20041227172543/http://www.fda.gov/ohrms/dockets/dailys/04/June04/060404/04p-0075-c00002-vol1.pdf.

**Figure 1. Impact of Reverse Payment Settlement on Brand Profits**



67.    For such an anticompetitive pact to be effective, brand and generic manufacturers require a means to divide the ill-gotten gains—the increased profit to the detriment of drug purchasers—that delayed competition makes possible. After all, the generic manufacturer will not refrain from competing if it does not share in the profit gains through some means. The means sometimes takes the form of payoffs from the brand manufacturer, deals that are often referred to as "pay-for-delay," "exclusion payment," or "reverse payment" agreements.

68.    The brand manufacturer may choose to—unlawfully—pay off only generic manufacturers. Pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. They extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

69.    The profit sharing through delayed entry can also take the form of market or profit allocations. Both the brand company and the generic company may decide, for example, that each will give up the ability to compete in some way (the brand by not launching an AG; the generic by delaying its initial entry) such that both can reap supracompetitive profits for certain periods of time. Such

CLASS ACTION COMPLAINT

allocations may not involve a "payment" at all—both the brand and generic forego some ability to compete, but do so in service of their goals to reach an agreement to increase their respective profits.

70.     Agreements such as these—whether "pay-for-delay" or market allocations—are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. They extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs and reduce competition among generics, forcing purchasers to pay more than they should.

### D.     No-AG Agreements Provide a Means for Brand and Generic Manufacturers to Share the Gains from Conspiring

71.     In the 1990s, pay-offs from brand manufacturers often took the form of cash payments to would-be generic competitors. Since the 2000s—as a result of regulatory scrutiny, congressional investigations, and class action lawsuits—brand and generic manufacturers have entered into increasingly elaborate agreements in an attempt to conceal anticompetitive agreements.

72.     One example is a "no-authorized generic" or "no-AG" agreement. With a no-AG agreement, the brand manufacturer agrees not to market an AG version of the brand drug for a specified period after the first generic enters the market in exchange for the first generic agreeing to a delayed entry date.

73.     No-AG agreements between a brand manufacturer and would-be generic competitors are sometimes explicit. At other times, such agreements may be structured in a way that ostensibly reserves some right in the brand manufacturer to sell a generic version of its branded product, but that still functions as a no-AG agreement, resulting in the same impact on competition as an explicit no-AG agreement. The FTC recognizes the existence and impact of such functional no-AG agreements. In a study by the FTC of the settlement agreements, the FTC explained that:

> The most common form of possible compensation—appearing in 9 final settlements—is a commitment from the brand manufacturer not to use a third party to distribute an authorized generic for a period of time, such as during first-filer exclusivity. This type of commitment could have the same effect as an explicit no-AG commitment, for example, if the brand company does not market generics in the United States.[41]

---

[41]  FTC, *Overview of Agreements Filed in FY 2016: A Report by the Bureau of Competition* (2017), https://www.ftc.gov/system/files/documents/reports/agreements-filled-federal-trade-commission-under-medicare-prescription-drug-improvement/mma_report_fy2016.pdf. *See also* FTC, *MMA Reports: No*

74. That same FTC report explained that an agreement that includes a "declining royalty structure, in which the generic's obligation to pay royalties is reduced or eliminated if a brand launches an authorized generic product" can have "the same effect as an explicit no-AG commitment."[42]

75. Absent a no-AG promise, it often makes economic sense for the brand manufacturer to begin marketing an AG through a third party as soon as (or sometimes weeks or months before) the first generic enters the marketplace. The AG entry enables the brand company to adopt a price strategy (competing with a low-priced generic), which diverts sales from what would otherwise be sold by the first generic. Competition from an AG typically cuts the first generic's revenues in half. Having two generics in the market (the generic and the AG), the two products compete on price. This lowers prices, delivering savings to payers of prescription drugs.

76. To prevent an AG from causing this substantial loss of revenues and profits, a generic may be willing to delay its entry into the marketplace in return for the brand manufacturer's agreement to forgo competing with an AG during the exclusivity period. The additional monopoly profits that the brand manufacturer gains from the delayed onset of generic competition more than make up for the profits it forgoes by temporarily not competing with its AG. The brand manufacturer benefits from the delayed onset of generic competition, while the generic gains from the absence of competition.

77. Those that bear the brunt of the higher prices lose. The brand and generic's reciprocal pledges not to compete harm purchasers thrice over. The pact delays generic entry into the marketplace, extending the time when the more expensive brand is the only product on the market.

78. For the generic, the difference between selling the only generic and competing against an AG for a period of time can amount to tens or even hundreds of millions of dollars, depending on the size of the brand's sales. A no-AG pledge thus has the same economic effect as a pay-off made in cash. As explained by the then-Chairman of the FTC:

> Because the impact of an authorized generic on [a generic manufacturers] revenue is so sizable, the ability to promise not to launch an AG is a huge bargaining chip the brand company can use in settlement negotiations with a [] generic. It used to be that a brand might say to a generic, "if you go

---

*tricks or treats – just facts*, October 27, 2020, https://www.ftc.gov/news-events/blogs/competition-matters/2020/10/mma-reports-no-tricks-or-treats-just-facts.

[42] *Id.*

away for several years, I'll give you $200 million." Now, the brand might say to the generic, "if I launch an AG, you will be penalized $200 million, so why don't you go away for a few years and I won't launch an AG."[43]

Courts agree that no-AG agreements are a form of payment actionable under *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) and are anticompetitive.[44]

79.    For a generic in a situation involving a brand drug with more than hundreds of millions or billions of dollars in annual sales, the difference between selling a generic without having to compete against another generic, whether AG or otherwise, amounts to tens, and in some instances, hundreds of millions of dollars. These economic realities are well known in the pharmaceutical industry. No-AG agreements thus allow competitors to benefit from an agreement not to compete, denying purchasers the consumer surplus that should flow to them from increased competition.

---

[43] "Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics," FTC (June 24, 2009), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authgenstatementleibowitz.pdf.

[44] *See In re Loestrin 24 Fe Antitrust Litig.*, Nos. 14-2071, 15-1250, 2016 U.S. App. LEXIS 3049, at *25-26 (1st Cir. Feb. 22, 2016); *In re Opana ER Antitrust Litig.*, No. 14 C 10150, 2016 U.S. Dist. LEXIS 16700, at *23-25 (N.D. Ill. Feb. 10, 2016); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 242 (D. Conn. 2015); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069 (N.D. Cal. 2014); *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 U.S. Dist. LEXIS 142206, at *62 (D.N.J. Oct. 6, 2014); *Time Ins. Co. v. AstraZeneca AB*, 52 F. Supp. 3d 705, 709-10 (E.D. Pa. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751 (E.D. Pa. 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 392 (D. Mass. 2013).

CLASS ACTION COMPLAINT

80.    **Figure 2** depicts what happens when a settlement agreement includes a no-AG promise. The red area shows the brand manufacturer's additional monopoly profits earned during the period of delay. The purple area shows the amount of monopoly profit the brand manufacturer gives up (i.e., shares with the generic) by not selling its own AG.

**Figure 2. Impact of No-AG Clause on Brand Profits**



81.    **Figure 3** depicts the generic manufacturer's principal considerations in deciding whether to accept a settlement that includes a no-AG agreement. Without a settlement, the generic could enter earlier—either when the 30-month stay expires ("at risk") or when it wins the litigation. The generic manufacturer's profits (gross margins) would be high during the any exclusivity period and then fall rapidly as additional generics enter. This profit flow is somewhat uncertain because (i) if the generic launches at risk, it could (theoretically) later be found to infringe a valid patent, and (ii) it is expected that the brand manufacturer will launch an authorized generic and capture approximately 50% of the generic's sales. With a no-AG promise, the profit flow occurs later but is more certain and is larger—roughly twice the size—because the generic manufacturer does not lose half of the market to the brand manufacturer's authorized generic and can charge a higher price.

CLASS ACTION COMPLAINT



Figure 3. Impact of No-AG Promise on Generic's Profits

82.     Pay-offs by means of no-AG clauses usually exceed the value that the generic could have obtained *even if it had won* the patent infringement litigation. By settling the patent case in exchange for a no-AG payoff, the generic converts any ANDA exclusivity period into *total* generic exclusivity that it was not otherwise entitled to, thus doubling its unit sales and making those sales at a higher price.

## VI.    FACTUAL ALLEGATIONS

### A.    Takeda's Development and Approval of Dexilant

83.     Defendant Takeda Pharmaceuticals U.S.A., Inc. is the registered holder of approved New Drug Application No. 22-287 for the manufacture and sale of the drug Dexilant (dexlansoprazole).

84.     Dexlansoprazole—marketed by Takeda under the trade name Dexilant—is a proton pump inhibitor ("PPI") used for the treatment of all grades of erosive esophagitis, maintaining healing of esophagitis, and treating heartburn associated with GERD.

85.     Dexlansoprazole works through the reduction in acid in one's stomach by blocking the final step of stomach acid production. It is released in two stages, based on different acidity levels in the human intestine.

86.     The FDA approved 30 mg and 60 mg dosage forms of Dexilant on January 30, 2009.

87.     Takeda originally marketed dexlansoprazole under the name Kapidex.

CLASS ACTION COMPLAINT

88.     In or around March 2010, Takeda began marketing Kapidex under the new name Dexilant to avoid potential confusion with two other medications.

89.     Dexilant generated significant revenue and profits for Takeda. Dexilant sales grew from approximately $200 million annually in 2010 to over $1 billion annually, starting in 2015 and continuing nearly every year thereafter until generic dexlansoprazole entered the market in 2022.

**B.     Takeda's Patents, Orange Book Listings, and ANDA Filings by Generic Manufacturers**

90.     Given the substantial market for Dexilant, it did not take long for other pharmaceutical companies to initiate efforts to introduce generic versions of the drug. Takeda has consistently owned and listed numerous patents in the Orange Book, claiming they cover Dexilant. Additionally, Takeda has asserted infringement claims on patent rights it believes were violated by generic Dexilant ANDA products, even though these claims were not included in a patent listed in the Orange Book.

91.     The patents asserted by Takeda concerning Dexilant (including those recorded in the Orange Book for NDA 22-287), along with their respective titles and expiration dates, are as follows:

| U.S. Patent No. | Title | Issue Date | Exp. Date | Orange Book |
|---|---|---|---|---|
| 7,737,282 (" '282 patent") | Benzimidazole Compound Crystal | 2/26/2009 | 6/15/2020 | No |
| 6,462,058 (" '058 patent") | A novel crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]sulfinyl]-1H-benzimidazole or a salt thereof of the present invention is useful for an excellent antiulcer agent | 10/8/2002 | 6/15/2020 | Yes |
| 6,939,971 (" '971 patent") | Benzimidazole Compound Crystal | 9/06/2005 | 6/15/2020 | Yes |

24

CLASS ACTION COMPLAINT

| U.S. Patent No. | Title | Issue Date | Exp. Date | Orange Book |
|---|---|---|---|---|
| 7,285,668 (" '688 patent") | Process for Crystallization of (R)- or (S)-Lansoprazole | 10/23/2007 | 6/15/2020 | Yes |
| 9,145389 (" '389 patent") | Benzimidazole Compound Crystal | 9/29/2015 | 6/15/2020 | Yes |
| 6,664,276 (" '276 patent") | Benzimidazole Compound Crystal | 12/16/2003 | 1/30/2023 | Yes |
| 8,722,084 (" '084 patent") | Controlled Release Preparation | 5/13/2014 | 10/15/2023 | Yes |
| 8,784,885 (" '885 patent") | Controlled Release Preparation | 7/22/2014 | 10/15/2023 | Yes |
| 8,461,187 (" '187 patent") | Multi PPI Dosage Form | 6/11/2013 | 1/17/2026 | Yes |
| 9,238,029 (" '029 patent") | Multi PPI Dosage Form | 1/19/2016 | 1/17/2026 | Yes |
| 9,011,926 (" '926 patent") | Method for Producing Granules | 04/21/2015 | 2/24/2026 | Yes |
| 7,790,755 (" '755 patent") | Controlled Release Preparation | 09/07/2010 | 8/02/2026 | Yes |

CLASS ACTION COMPLAINT

| U.S. Patent No. | Title | Issue Date | Exp. Date | Orange Book |
|---|---|---|---|---|
| 8,105,626 ("'626 patent") | Granules Containing Acid-Unstable Chemical In Large Amount | 01/31/2012 | 9/27/2026[45] | Yes |
| 8,871,273 ("'273 patent") | Method for Producing Granules | 10/28/2014 | 1/11/2028 | Yes |
| 8,173,158 ("'158 patent") | Methods of Treating Gastrointestinal Disorders Independent of the Intake of Food | 05/08/2012 | 3/17/2030[46] | Yes |
| 9,233,103 ("'103 patent") | Methods for Treating Heartburn, Gastric Bleeding or Hemorrhage in Patients Receiving Clopidogrel Therapy | 01/12/2016 | 3/05/2032 | Yes |

92.     Due to Takeda's listing of patents in the Orange Book for Dexilant, potential generic competitors were required to certify against any patents listed at the time when they filed ANDAs for their generic Dexilant products.

93.     The first pharmaceutical company to file an ANDA and certify against Takeda's then-listed patents for the 60 mg generic dexlansoprazole product was Handa Pharmaceuticals, LLC ("Handa"). Handa submitted its ANDA on August 25, 2010, with a Paragraph IV certification to Takeda's then-listed patents. In April 2012, Handa transferred its ANDA to Par Pharmaceutical Companies Inc. ("Par").

94.     The first pharmaceutical company to file an ANDA and certify against Takeda's then-listed patents for the 30 mg generic dexlansoprazole product was Impax Laboratories, Inc. ("Impax"). Impax filed its ANDA on November 30, 2010, also with a Paragraph IV certification to Takeda's then-listed patents.

[45] With an extension for pediatric exclusivity until March 27, 2027.
[46] With an extension for pediatric exclusivity until September 17, 2027.

CLASS ACTION COMPLAINT

95.    Generic manufacturer Anchen Pharmaceuticals, Inc. ("Anchen") filed ANDAs for both the 30 mg and 60 mg generic dexlansoprazole products, which it subsequently transferred to Defendant TWi in May 2011. Like the first filers Par and Impax, TWi also filed Paragraph IV certifications against one or more of the Takeda patents listed in the Orange Book.

96.    Other generic manufacturers filed ANDAs for 30 and/or 60 mg dexlansoprazole after Par, Impax, and TWi that included Paragraph IV certifications.

**C.    Takeda's Infringement Suits Against Generic Manufacturers and 2013 Trial Rulings**

97.    The ANDA filings for generic dexlansoprazole, along with their corresponding Paragraph IV certifications, led Takeda to initiate multiple patent infringement lawsuits against TWi, Par, Impax, and others.

**1.    Litigation Concerning the '282, '755, '058, '276, '971, and '668 Patents**

98.    The first and only trial concerning Takeda's various Dexilant lawsuits occurred in June 2013 in the Northern District of California, presided over by Magistrate Judge Joseph C. Spero. This trial consolidated Takeda's pending actions and claims against TWi, Par, and Impax. The central issues addressed during the trial included whether each ANDA infringed various claims of the '282, '755, '058, '276, '971, and '668 patents, the adequacy of the disclosures in these patents, and whether the patents were anticipated or obvious in light of prior art. The court's claim construction ruling narrowed some infringement claims, and subsequently, during summary judgment, the court resolved additional infringement claims for each ANDA holder and certain validity questions regarding the asserted patents.

99.    Regarding TWi, Takeda conceded that TWi's ANDA did not infringe four patents: '058, '276, '971, and '668, leading the court to enter final judgment in TWi's favor concerning those patents. During summary judgment, the court, on April 8, 2013, determined that TWi's ANDA did not infringe the '755 patent; however, it granted Takeda's summary judgment motion, concluding that TWi's ANDA infringed claims 1 and 2 of the '282 patent. The court also denied TWi's motion challenging the validity of the '282 patent based on anticipation.

100.    As for Par, the court found during summary judgment that Par's ANDA did not infringe the '755 patent; however, it denied Par's summary judgment motion for non-infringement of the '276

CLASS ACTION COMPLAINT

patent, citing remaining triable issues of fact regarding that patent's infringement. The court also denied Par's motion on the invalidity of the '282 patent based on anticipation and granted summary judgment to Takeda, confirming that Par's ANDA infringed the '282 patent.

101.    In the case of Impax, the court found at summary judgment that Impax's ANDA did not infringe the '755 patent; however, it granted Takeda's summary judgment motion, determining that the '058, '276, and '971 patents were infringed by Impax's ANDA. The court rejected Impax's claims that the '971 patent lacked an adequate written description to support the asserted claims and denied Impax's cross-motion for non-infringement of the '971 patent.

102.     Consequently, the following issues remained for trial: (a) infringement of the '276 patent against Par (Handa); (b) validity of the '276, '058, and '971 patents as obvious in view of prior art; (c) validity of the '282 patent concerning anticipation, obviousness, or lack of sufficient written description; (d) questions regarding the standing of certain Takeda entities to assert infringement of the '282 patent; and (e) whether Takeda could establish jurisdiction under the Declaratory Judgment Act ("DJA") against TWi for infringement of the '282 patent under §271(a) of the Patent Act.

103.    Following a weeklong trial, on October 17, 2013, the district court issued its Findings of Fact and Conclusions of Law, determining that: (a) Par's product infringed the '276 patent; (b) the '276, '058, and '971 patents were not obvious in light of prior art; (c) the '282 patent was neither anticipated nor obvious in view of prior art and did not lack sufficient written description; (d) the Takeda entities had standing to assert the '282 patent against TWi; and (e) Takeda could not invoke the DJA against TWi for infringement of the '282 patent under §271(a).

104.    During the trial, TWi presented evidence suggesting that the '282 patent was invalid based on anticipation in prior art or obviousness.

> Takeda concedes that the '282 patent's asserted claims are anticipated by the prior art Larsson and Von Unge references, unless the claim term "amorphous" is construed as limited to *solid* compounds. There is no "clear indication in the intrinsic record" justifying limiting the term to just solids. *E.g.*, *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Takeda does not contest its own expert's testimony that the "plain and ordinary meaning" of amorphous includes nonsolids. (A1985; A1989.) Rather, Takeda admits that the extrinsic evidence shows that the term "amorphous" can be used to refer to liquids, but argues that it "typically"

refers to solids. (Red Bf. 18–19.) That is not enough to limit the claims to solids, because claims are not limited only to what is "typically" used. *E.g.*, *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1374 (Fed. Cir. 2006).

Even if limited to only solids, the asserted claims of the '282 patent are invalid in view of the prior art Barberich reference, either alone or in combination with the other prior art. Only Takeda's argument in the District Court that Barberich was not enabled stood in the way of a holding of invalidity. But on appeal, in an attempt to deflect from its patent's written description problems, Takeda has conceded that "it is undisputed that a person of ordinary skill in the art could create a salt of an amorphous compound of dexlansoprazole (which must be solid under the Court's claim construction) based on the disclosure in Barberich." (Red Bf. 27.) That disposes of Takeda's ability to argue nonenablement of Barberich. Furthermore, the prior art taught three ways to make the solid amorphous solid dexlansoprazole disclosed by Barberich. Takeda myopically focuses its comments on the alleged difficulty in literally following the procedure in the Larsson reference. However, any procedure available in the prior art is sufficient. *E.g.*, *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1381 (Fed. Cir. 2003). Moreover, the law embraces adaptations within the skill in the art. *E.g.*, *In re Lamberti*, 545 F.2d 747, 750 n.2 (CCPA 1976).[47]

105.     The court's final judgment prevented TWi from securing approval for its ANDA until the expiration of the '282 patent on June 15, 2020. Similarly, Impax and Par, also hindered by the '282 patent, were further barred from obtaining approval until January 30, 2023. For Impax, this was contingent upon the expiration of the '058, '276, and '971 patents, while for Par, it depended on the expiration of the '276 patent. These timelines were subject to potential patent term extensions for those patents currently under review at the PTO.

106.     The implications of these rulings were significant: unless overturned on appeal, TWi would be able to enter the market after the expiration of the '282 patent on June 15, 2020. In contrast, Par and Impax were blocked until at least January 30, 2023. Consequently, TWi effectively leapfrogged over Par and Impax in terms of market entry, as they had forfeited their first filer status due to their trial losses.

---

[47] TWi Pharm., Inc.'s Response and Reply Brief, *Takeda Pharm. Co. Ltd., et al. v. TWi Pharma., Inc.*, Appeal Nos. 14-1074, 14-1129 (Fed. Cir. Nov. 24, 2014).

107.    Takeda recognized TWi's position of advantage compared to other generics due to the trial rulings, stating in a post-trial press release: "[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020."[48]

## 2.    Litigation Concerning the '158 and '187 Patents

108.    On April 26, 2013, Par filed a complaint against Takeda seeking a declaratory judgment of invalidity and/or non-infringement of the '626 and '158 patents. No. 5:13-cv-01927, ECF No. 1. On May 29, 2013, Takeda answered Par's complaint and served counterclaims alleging Par infringed or would infringe the '158 patent (but not the '626 patent). *Id.*, ECF No. 20. The same day, Takeda filed patent infringement cases against Impax (No. 5:13-cv-02416), Sandoz (No. 5:13-cv-02418), and TWi (No. 5:13-cv-02420) regarding the '158 patent. These cases were related in front of Judge Lucy H. Koh. No. 5:13-cv-01927, ECF No. 29. As discussed below, Takeda settled its patent infringement claims against Par and Impax in 2014 before any dispositive decisions on the patent infringement claims.

109.    On July 9, 2013, Takeda amended its complaint against TWi to add an infringement claim concerning the '187 patent and later filed a second amended complaint concerning both patents. No. 5:13-cv-02420, ECF No. 17. Takeda filed a case narrowing statement on February 2, 2015, indicating that Takeda was asserting seven claims: claim 1 of the '158 patent and claims 1, 2, 5, 6, 7, and 16 of the '187 patent. ECF No. 138. The '158 and '187 patents were listed in the *Orange Book* after TWi (through Anchen) made its paragraph IV certification on Dexilant.

110.    On February 19, 2015, TWi moved for summary judgment on the '158 and '187 patents. Specifically, TWi argued that the asserted claims of the '187 patent are anticipated by Takeda Japan's offer to sell TAK-390MR (the development code name for Dexilant) to TAP (a Takeda joint venture). TWi also argued that the asserted claims of both the '187 and '158 patents were anticipated by prior art. Alternatively, TWi argued that the '158 patent was not infringed. Takeda moved for summary judgment only on TWi's affirmative defenses of inequitable conduct.

---

[48] Alex Lawson, *Takeda Triumphs In Suits To Block Generic Dexilant*, Law360 (Nov. 4, 2013), https://www.law360.com/articles/485773/takeda-triumphs-in-suits-to-block-generic-dexilant

CLASS ACTION COMPLAINT

111.    The court granted in part and denied in part the parties' summary judgment motions. Specifically, TWi's motion was granted as to non-infringement under the doctrine of equivalents and otherwise was denied. Takeda's motion was granted as to the '158 patent and denied as to the '187 patent.

112.    TWi's argument that the '187 and '158 patents are invalid was supported by ample evidence. As to the '187 patent, TWi presented evidence that Takeda Japan offered to sell TAK-390MR to TAP. If TWi could prove by clear and convincing evidence that (1) "the product [was] the subject of a commercial offer for sale"; and (2) "the invention [was] ready for patenting," the '187 patent would be invalid. The Offer Letter contained a "Supply Term" stating that "TAP *shall purchase* TAK390MR preparations from [Takeda Japan] until the last TAK390MR patent is expired." TAP's legal counsel went further, stating that "[o]f course, we are certainly willing to state in the License Agreement that TAP will buy all of its requirements from Takeda if the parties later are able to arrive at a mutually acceptable price." And the Offer Letter contained other terms that, according to the Court, were "indicative of an offer for sale," including "an initial payment of 3 billion Yen upon signing the license agreement, a royalty payment of 6% of net sales, and a transfer price per 60 mg capsule." TAPs former CEO admitted that this document stated the price at which TAP "would buy the capsule…." The Offer Letter also indicated that the transfer price would be the same for TAK-390MR as for Prevacid, which Takeda Japan was already selling to TAP. The day after Takeda Japan made the Offer, Takeda Japan and TAP met in Chicago to discuss the offer, and both inventors of the '187 patent were present. At that meeting Takeda informed TAP that Takeda had filed "the patents covering TAK-390MR technologies." Given this evidence, TWi was well positioned to succeed at trial to invalidate the '187 based on an offer of sale.

113.    TWi also presented ample evidence that the '187 and '158 patents were anticipated by prior art, specifically the Akiyama II patent—the '755 patent. Although Takeda disputed that Akiyama II is prior art to the '187 patent, it admitted that Akiyama II would anticipate the '187 patent if it is prior art. The '187 patent has an earliest filing date of June 16, 2004. Akiyama II was issued on September 7, 2010, but the international application from which Akiyama II is derived was filed in English on October 15, 2003, and lists the United States as one of the countries in which the inventors

sought a patent. The parties thus agreed that the earliest priority date of Akiyama II was October 15, 2003, which is before the application for the '187 patent was filed. The parties also agreed that Example 57 of Akiyama II discloses TAK390-MR (i.e., Dexilant). TWi asserted, and Takeda's expert did not dispute, that Example 57 meets every limitation of the asserted claims of the '187 patent. Thus, the only anticipation issue regarding the '187 patent was whether the inventors conceived of the '187 patent prior to October 15, 2003—at least eight months before they filed the application for the '187 patent—and more specifically, whether a single limitation in claim 1 of the '187 patent was anticipated, namely the limitation that the second dose of the drug contain at least 10% more of the drug than the first dose.

114.    TWi presented evidence that one of the inventors of the '187 patent, who was also Takeda's Fed. R. Civ. P. 30(b)(6) witness regarding the conception and reduction to practice of the asserted claims, testified that results from a study available on December 22, 2003, led to the conception of the "at least 10%" limitation. In a declaration submitted in connection with summary judgment, a different inventor stated that the inventors had conceived of increasing the dose by at least 100% by March 2003, before Akiyama II. Takeda would not have prevailed using this argument at trial. Under controlling Federal Circuit precedent cited by the court in connection with summary judgment, a "sufficiently generalized" conception of a species within the genus of the claim limitation does not constitute conception of the entire genus. An increase of at least 100% is so far afield from an increase of 10% that, under the standards applicable at trial, TWi would have prevailed in showing that the inventors had not conceived of this key claim limitation until after the date of Akiyama II, and thus the '187 patent was anticipated.

115.    The court also denied Takeda's motion for summary judgment on TWi's defense of inequitable conduct regarding the '187 patent, leaving this defense available to TWi at trial. The inventors of the '187 patent affirmed in a declaration under oath to the Patent Office that they were the first to invent the subject matter of the '187 patent but did not disclose Akiyama II. The court held Akiyama II was material only if it was prior art—which, as explained above, it likely would be found to be at trial—and that "a reasonable fact finder could conclude that the '187 Patent inventors knew that

they were not the first to invent, but submitted a declaration to the Patent Office stating otherwise. The knowing submission of a false declaration 'raises a strong inference of intent to deceive.'"

116.     Regarding the '158 patent, Takeda did not dispute that Akiyama II is prior art to the '158 patent but disputed that Akiyama II anticipates claim 1 of the '158 patent. The sole issue with regard to anticipation was whether Example 57 of Akiyama II anticipates the "regardless of whether the patient is under fasted or fed conditions" limitation in claim 1 of the '158 patent. Akiyama II did not specify whether the drug should be administered with or without food, suggesting that the drug could be administered under fasted or fed conditions. Takeda argued that a person of skill in the art reading Akiyama II would expect to administer the drug under fed conditions, but Takeda mainly relied on evidence from well after Akiyama II. As a result, TWi would have prevailed on this issue at trial as well.

117.     The court also held there was a genuine dispute of fact as to literal infringement of claim 1 of the '158 patent, but that Takeda could not assert infringement under the doctrine of equivalents as a matter of law. Therefore, if Takeda were to lose on literal infringement, it would not succeed on its infringement claim. As to literal infringement, the court found that whether to grant summary judgment to TWi was a "close call," suggesting that Takeda's arguments were weak and would have lost at trial. Thus, Takeda would not have been able to show infringement of the '158 patent at trial.

**D.     Takeda Resolves Each of Its Dexilant Patent Cases After the Initial Trial**

118.     Following the trial rulings, Par, TWi, and Impax all appealed the unfavorable aspects of the district court's decision to the Court of Appeals for the Federal Circuit. Takeda also cross-appealed the district court's determination that neither Par, TWi, nor Impax had infringed the '755 patent.

119.     TWi presented a compelling appeal challenging the validity of the '282 patent, which was the only patent that the district court found TWi had infringed. Specifically, TWi contended that the district court had misinterpreted the claim term "amorphous compound" by restricting it to solids, asserting that, when properly construed, the claims were anticipated by prior art. Furthermore, TWi argued that even under the district court's interpretation, the claims were invalid due to a lack of written description and/or because they were anticipated or would have been obvious based on prior art.

120.    During the oral argument before the Federal Circuit on March 6, 2015, TWi's arguments regarding anticipation and obviousness resonated with the appellate panel. One of the judges questioned whether Judge Spero's failure to consider the evidence on this matter was "clearly erroneous" and inconsistent with the presented evidence.

121.    In contrast, Takeda's appeal challenging the district court's determination that none of the defendants had infringed the '755 patent was relatively weak. The claim language was unambiguous, and Takeda itself initially supported the claim construction adopted and applied by the district court.

122.    Ultimately, all parties reached a settlement before the Federal Circuit issued a ruling and while Takeda litigated the '158 and '187 patents. Takeda settled with Par around July 18, 2014, and with Impax around October 16, 2014.

123.    Takeda's settlement with TWi took longer to finalize. Approximately seven weeks after the oral argument before the Court of Appeals for the Federal Circuit, and right after the summary judgment order on the '158 and '187 patents, Takeda, recognizing that its arguments were being met with skepticism by the judges, settled with TWi around April 27, 2015.

124.    By the end of 2015, Takeda had resolved its ongoing infringement actions against all generic manufacturers it had sued concerning ANDAs for Dexilant.

### E.    The Settlement Between Takeda and TWi Included an Unlawful "reverse payment" and Market Allocation Agreement

125.    Takeda's agreement with TWi to resolve their ongoing patent disputes concerning Dexilant was a "reverse payment" and market allocation agreement that violates antitrust laws.

126.    Despite having a strong position for appeal and the impending expiration of the patent on June 15, 2020, TWi agreed to postpone the launch of its generic Dexilant product until January 2022—approximately 18 months after the '282 patent expired. This delay was agreed to because Takeda promised to make substantial and unjustified payments to TWi in exchange. Initially, Takeda paid TWi $9.5 million as part of this agreement, which TWi acknowledged in an annual financial report.

> On April 27, 2015, the Company and Takeda Pharmaceutical Company
> Limited and its American Subsidiaries (individually and collectively

"Takeda") entered into a settlement agreement with regards to pending patent litigations. **In accordance with the terms of the agreement, Takeda paid the Company US$9,500 thousand**. (emphasis added).

127.    This payment far exceeded any reasonable estimate of Takeda's future litigation expenses. By the time of the payment, the core claims had already been tried before the district court and fully briefed and argued to the appellate court. Moreover, while Takeda had filed a separate case against TWi regarding two other patents, at the time of the settlement, the issues in that later-filed case had been narrowed through an order resolving cross-motions for summary judgment, and TWi presented strong arguments that it would succeed at trial.

128.    In addition to the $9.5 million payment, the agreement TWi with a monopoly on the sales of generic Dexilant—the economic equivalent of a no-AG agreement. Under the terms of the Agreement, Takeda gave TWi the option of launching an AG version of Dexilant rather than launching its own ANDA product (assuming FDA approval).

129.    Given a choice between launching an AG and launching its own ANDA product, a generic manufacturer will almost always find it more profitable to launch the AG and forgo launching the ANDA product, particularly if entry by other ANDA filers is unlikely for some significant period of time. If the generic chooses to launch its ANDA product, the brand company will normally find it profitable to launch an AG to capture some portion of the sales that would otherwise go to the ANDA filer, splitting those sales and lowering generic prices. The generic manufacturer will almost always earn higher profits if there is a generic monopoly rather than a duopoly, even if it is required by the terms of the agreement to share those monopoly profits with the branded company.

130.    Takeda has a long history of launching AG products through one or more third parties and likely would have done the same with generic Dexilant had it not given TWi the option to launch the Dexilant AG.

65. By giving TWi the option to launch an AG for Takeda, it effectively gave TWi the opportunity to be the exclusive seller of generic Dexilant for a period of time. This promise was extremely valuable to TWi and induced TWi to accept a later entry date.

131.    TWi's press release shortly after the settlement summarizes its AG rights in part as follows:

> As part of the settlement, the parties also entered into a License and Supply Agreement allowing TWi and its affiliates to sell Dexilant® in both dosage strengths as ***the*** Authorized Generic. (emphasis added)

***

> Furthermore, the license and supply of the Authorized Generic from Takeda allows TWi to be ***the supplier of both strengths of a generic Dexilant® in the U.S. market for a period, which provides significant sales and marketing advantage*** as well as furthering TWi's goal of bringing affordable healthcare to patients. (emphasis added)

132.    Consistent with the parties' agreement that TWi's AG rights would be exclusive, TWi describes them using the definite term "the" rather than the indefinite terms "a" or "an," which would be the appropriate word choice for a non-exclusive arrangement.

133.    TWi's references to an agreed period of time where it would have a "significant sales and marketing advantage" is also important. If Takeda retained the right to launch an AG in competition with the AG launched by TWi, there would be no need for the agreement to contain a set time period and no "significant sales and marketing advantage" during such time period.

66.    As promised to Takeda, TWi did not enter the market on June 15, 2020, when the '282 patent expired. Instead, TWi waited until on or around January 3, 2022, to launch an AG product pursuant to its license from Takeda.

134.    Takeda has never launched an AG Dexilant product to compete with TWi.

135.    In fact, as previewed by TWi in its 2015 press release just after the Agreement was signed, the AG product TWi sold in 2022 was the sole generic on the market for nearly a year, until November 22, 2022, when Par launched a generic 60 mg dexlansoprazole delayed release capsule.

136.    Due to their unlawful Agreement, both Takeda and TWi benefitted by avoiding fair and legal competition.

137.    Takeda benefited because, rather than face competition from a generic Dexilant product, Takeda enjoyed a complete monopoly until January 2022.

138.    This unlawful extension of Takeda's monopoly allowed Takeda to continue profitably charging supracompetitive prices to purchasers much longer than would have otherwise been possible.

139.    Sales of the AG product sold by TWi exceeded $328 million in 2022 alone. Had Takeda launched an AG to compete with TWi's ANDA product, the AG would have captured a large share of those sales.

140.    Indeed, an FTC Study from 2011 found that AGs reduce a first-filer generic's revenues by about 50% on average during the first six months.

141.    By giving TWi the option to launch the AG rather than Takeda, Takeda effectively gave up at least a portion of the sales it would have made by launching an AG—a large transfer of value from Takeda to TWi.

142.    While TWi lost time on the market by waiting until January 2022, the lack of competition TWi enjoyed when it did enter as the sole generic, along with the $9.5 million payment from Takeda, more than compensated TWi for the delay.

**F.    Takeda Entered Into Other Alleged Improper Agreements with Competitors During this Same Time Period**

143.    During this period, Takeda had a practice of entering into anticompetitive agreements with its competitors.

144.    Approximately seven months before the Defendants' Agreement regarding Dexilant, Takeda entered into an agreement with generic competitor Par concerning another Takeda drug, Amitiza (referred to as the "Amitiza Agreement"). Similar to Defendants' Dexilant Agreement, the Amitiza Agreement is alleged to have been structured to inhibit competition. Specifically, Par consented to postpone the launch of its generic Amitiza product in exchange for an implicit no-AG commitment from Takeda. Several antitrust lawsuits have been initiated concerning the Amitiza Agreement, and the court overseeing one such case denied Takeda's motion to dismiss, determining that the complaints plausibly alleged an antitrust violation.

145.    A little over a year after the Amitiza Agreement, and within a year of the Defendants' Dexilant Agreement, Takeda entered into additional agreements with competitors, this time concerning Takeda's drug Colcrys (referred to as the "Colcrys Agreement"). According to the plaintiffs in another antitrust case against Takeda, the company allegedly colluded with generic competitors to allocate the market for Colcrys. Under the Colcrys Agreement, generic competitors purportedly agreed to delay their market entry in exchange for defined periods of exclusivity at a later date. The plaintiffs in the

CLASS ACTION COMPLAINT

Colcrys case successfully defeated a motion to dismiss and a motion for summary judgment, and Takeda ultimately settled at trial before a verdict was reached.

**G.    If Takeda Retained the Right to Launch an AG or Received Royalties from TWi, such Facts Would Not Change the Illegality of Defendants' Agreement**

146.    The terms of the Defendants' Dexilant Agreement were not made public. However, Takeda and other pharmaceutical companies have previously entered into similar reverse payment agreements with competitors, as alleged in the Amitiza case. To avoid scrutiny, these agreements purportedly reserve rights to launch AGs and/or require royalties from the generic competitor once it eventually enters the market after a delay.

147.    Even if the Defendants' Agreement contained such provisions, it would not alter the illegality of the Defendants' conduct. Regarding No-AG agreements, courts, including those involved in the Amitiza lawsuit against Takeda, have determined that such agreements do not need to be explicit; "implicit no-AG agreement[s]" are also deemed unlawful. Sharing monopoly profits via royalties by the generic does not change this analysis.

148.    Thus, even if Takeda claims to reserve the right to launch another AG in the Defendants' written agreement, the facts—such as Takeda's failure to exercise any such right and TWi's statements suggesting exclusivity—indicate that this reservation was merely a pretext.

149.    Moreover, even if TWi made some royalty payments to Takeda, these would not negate the reverse payment from Takeda to TWi. In fact, as Takeda has done in the past, the royalty amounts and/or structure were designed to reinforce Takeda's commitment to refrain from launching an AG. For instance, a declining royalty structure, where Takeda would receive less if it launched an AG to compete with TWi, would financially disincentivize Takeda from launching an AG and would not mitigate the anticompetitive effects of the Defendants' Agreement.

**H.    In the Absence of Defendants' Agreement, Two Generics Would Have Been Available, at a Much Lower Price Point, by Approximately June 15, 2020 or Earlier**

150.    In the absence of Defendants' unlawful Agreement, at least two generics would have been available by June 15, 2020, when the '282 patent expired, rather than merely the branded Dexilant.

151. Specifically, absent the unlawful Agreement, TWi would have launched its generic product under its own ANDA on or about June 15, 2020. In turn, Takeda would have sold an AG to compete with TWi's product to capture some of the generic market.

152. TWi's ANDA would have been approved on or before its entry date in 2020. TWi's ANDA was ultimately approved in September 2022, but approval would not have taken that long if not for Defendants' unlawful Agreement. FDA has a practice of focusing its limited resources on the approval of products whose launches are imminent. TWi's agreement to delay its launch, coupled with its ability to come to market as an AG under Takeda's NDA, disincentivized TWi from seeking earlier approval and eliminated the need for FDA to act on TWi's application sooner.

153. There was also no first filer exclusivities standing in the way of TWi. The exclusivity of the first filers—Par on the 60 mg product and Impax on the 30 mg product—were forfeited due to their delays in getting their products tentatively approved and/or the findings of non-infringement at trial as to TWi on patents that were blocking the first filers.

154. Takeda's patents would not have delayed TWi's entry date. Takeda stipulated that several of its patents, specifically, the '058, '276, '971 and '668 patents, would not be infringed by TWi, and TWi prevailed at trial on all but the '282 patent, which expired in June 2020. Takeda recognized, before its unlawful Agreement with TWi, that generic entry was likely in June of 2020, stating: "[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020."

155. While Takeda sued TWi on two other patents—the '187 and '158 patent—in a separate lawsuit, had the parties not settled, TWi would have prevailed. Among other reasons, these patents were plainly invalid due to prior art and TWi presented strong evidence that the '187 was invalid due to prior offer of sale. The court also held that Takeda could not assert as a matter of law that claim 1 of the '158 patent was infringed under the doctrine of equivalents, meaning Takeda had to prove literal infringement—a tall bar given the court's finding that this issue was a "close call" at summary judgment. And Takeda's remaining patents purportedly covering Dexilant would have been easy for TWi to either design around or carve out or been subject to noninfringement or invalidity defenses similar to those TWi advanced against the '187 and '158 patents.

## VII.    MARKET POWER AND DEFINITION

156.    The pharmaceutical marketplace is characterized by a "disconnect" between product selection and payment obligations. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Dexilant, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's prescription drug coverage provider (such as Plaintiff and class members) has the obligation to pay the vast majority of the product's price.

157.    Brand manufacturers, including Takeda, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors about the cost of the branded products. Studies show that doctors are typically unaware of the relative costs of brand pharmaceuticals, and even when they are aware of these costs, they are largely insensitive to price differences because they do not bear the direct costs of purchasing the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

158.    The relative unimportance of price to the prescriber reduces what economists call the price elasticity of demand—the extent to which unit sales decrease when the price increases. This reduced-price elasticity, in turn, allows brand manufacturers to raise prices substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Takeda.

159.    Since at least June 2020, Takeda has had monopoly power in the market for brand Dexilant. Between June 2020 and January 2022, Takeda was the sole seller of Dexilant. During this time, Takeda had the power to exclude competition and/or raise or maintain the price of Dexilant at supracompetitive levels without losing enough sales to make supracompetitive prices unprofitable.

160.    Between January 2022 and November 2022, Defendants allocated the market, providing TWi with monopoly power by making TWi the sole seller of generic Dexilant. During this time, TWi

and Takeda had substantial market power in the market for Dexilant and its AB-rated generic equivalents because they had the power to exclude competition and/or raise or maintain the price of dexlansoprazole at supracompetitive levels without losing enough sales to make supracompetitive prices unprofitable.

161.    Before approximately January 3, 2022, a small but significant, non-transitory increase to the price of brand Dexilant would not have caused a significant loss of sales. From approximately January 3, 2022 until at least November 2022, a small but significant, non-transitory increase in the price of generic Dexilant would not have caused a significant loss of sales.

162.    Brand Dexilant does not exhibit significant, positive cross-elasticity of demand with respect to price with any other PPI products or treatment for GERD other than AB-rated generic versions of Dexilant. For example, as of December 31, 2021, Dexilant was priced at a significant premium to non-Dexilant generic PPIs on the market. Even with premium pricing, Dexilant obtained broad insurance coverage and favorable access. As of December 2021, approximately 87% of commercially covered lives and 82% of Medicare covered lives had access to Dexilant. Furthermore, of those commercially covered lives, 48% had unrestricted access to the drug without prior authorization or step edits and 28% of patients had access at the lowest branded cost tier.

163.    Brand Dexilant is differentiated from all other PPI products and all other GERD treatments, other than the AB-rated generic versions of Dexilant.

164.    Takeda needed to control only brand Dexilant and its AB-rated generic equivalents, and no other products, in order to maintain the price of dexlansoprazole profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions would render Defendants unable to profitably maintain their prices for Dexilant without losing substantial sales. Defendants have, and have exercised, the power to exclude generic competition to brand Dexilant.

165.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected and continue to protect branded Dexilant from the forces of price competition.

166.    There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Defendants' ability to control the price of Dexilant, and to exclude relevant

competitors, without the need to show the relevant antitrust markets. The direct evidence consists of the following facts, among others: (i) generic Dexilant would have entered the market at a much earlier date, at a substantial discount to brand Dexilant, but for Defendants' anticompetitive conduct; and (ii) Takeda's gross margin on Dexilant (including the costs of ongoing research/development and marketing) at all relevant times was very high.

167.    To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust market is the market for Dexilant and its AB-rated generic equivalents.

168.    The United States, including the District of Columbia and the U.S. territories, constitutes the relevant geographic market.

169.    Takeda's market share in the relevant market was 100% until approximately January 3, 2022, when TWi entered the market with an AG. Between approximately January 3, 2022, and November 2022, Defendants market share of Dexilant and its AB-rated generic equivalents was 100%.

## VIII.    ANTITRUST IMPACT

170.    Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Dexilant, and later TWi's authorized generic, from competition. These actions allowed Defendants to extend Takeda's brand-name Dexilant monopoly and then established TWi as the sole seller of generic Dexilant for a period of time.

171.    Defendants' exclusionary conduct delayed and restricted competition and unlawfully enabled Takeda to sell brand Dexilant, and TWi to sell AG Dexilant, without further generic competition. Were it not for Defendants' illegal conduct, one or more generic versions of Dexilant would have entered the market in June 2020, and TWi's generic product would have faced competition from a Takeda AG.

172.    For the period of June 2020 through January 2022, Takeda's brand product was the only Dexilant product on the market. But-for Defendants' conduct, during that time period, a TWi generic and a Takeda AG would have been on the market. From January through November 2022, TWi was the sole seller of generic Dexilant (in the form of the TWi AG). But-for Defendants' conduct, during that time period, a Takeda AG would have competed with the TWi AG. After November 2022, prices for

generic Dexilant have been higher than they would have been absent Defendants' conduct because earlier competition would have caused prices to drop more significantly and sooner.

173.    Defendants' conduct to delay and restrict competition for Dexilant caused Plaintiff and members of the Class to pay more than they would have paid for brand and generic Dexilant.

174.    General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for Dexilant results in higher prices at every level below.[49] The institutional structure of pricing and regulation in the pharmaceutical industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiff and members of the proposed Class.

175.    If competition had not been unlawfully delayed and restrained, Plaintiff and Class members would have (a) paid lower prices on their remaining brand purchases of Dexilant, (b) substituted purchases of less-expensive generic Dexilant for their purchases of more-expensive brand Dexilant, and/or (c) purchased generic Dexilant at lower prices sooner.

176.    Plaintiff and Class members have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount, as well as the forms and components of such damages, will be calculated after discovery and upon proof at trial. Commonly used and well-accepted economic models can be employed to measure both the extent and the amount of the supracompetitive charge passed through the distribution chain to payors, such as Plaintiff and Class members.

177.    The supracompetitive prices Plaintiff and Class members paid and continue to pay are traceable to, and the direct, proximate, and foreseeable result of Defendants' anticompetitive conduct.

## IX.    INTERSTATE AND INTRASTATE COMMERCE

178.    During the relevant time period, Takeda and TWi manufactured, sold, and shipped brand and generic Dexilant across state lines in an uninterrupted flow of interstate commerce.

---

[49] Herbert Hovenkamp, Federal Antitrust Policy, The Law of Competition and its Practice 624 (1994). Professor Herbert Hovenkamp states that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top." He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level." *Id*

CLASS ACTION COMPLAINT

179.    During the relevant time period, Plaintiff and Class members paid and/or provided reimbursement for substantial amounts of brand and generic Dexilant manufactured and initially sold by Takeda and TWi. As a result of Defendants' illegal conduct, Plaintiff and Class members were compelled to pay, and did pay, artificially inflated prices for brand and generic Dexilant, and should have paid far less for a generic version of the drug were it available and but for Defendants' conduct.

180.    During the relevant time period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. All Defendants engaged in illegal activities, as charged herein, within the flow of and substantially affecting interstate commerce.

181.    Defendants' conduct was within the flow of and was intended to have and did have a substantial effect on interstate commerce of the United States, including in this district.

182.    During the Class period, each Defendant, or one or more of each Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme. The scheme in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

183.    Defendants' conduct has also had substantial intrastate effects in that, among other things, consumers and third-party payers have been prevented from purchasing more affordable generic versions of Dexilant in each state. Defendants' conduct materially deprived the consuming public—including hundreds, if not thousands, of purchasers in each state—of any choice to purchase more affordable versions of Dexilant. The absence of competition to Dexilant has directly and substantially affected and disrupted commerce within each state and substantially affected commerce within each state.

## X.    CLASS ACTION ALLEGATIONS

184.    Plaintiff brings this action on behalf of itself and all others similarly situated as a class action under Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages on behalf of the following Class:

> All persons, including all individuals and entities, that paid and/or provided reimbursement for some or all the purchase price for brand or generic Dexilant that was sold in Alaska, Arizona, Arkansas, California,

44

CLASS ACTION COMPLAINT

Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin that, for consumption by themselves or their members, employees, insureds, participants, or beneficiaries, and other than for resale, during the time period from June 15, 2020, through and until the anticompetitive effects of the Defendants' unlawful conduct cease.

185.    The following persons are excluded from the Class:

   a)   Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates;

   b)   All federal and state governmental entities, which do not include for cities, towns, municipalities or counties with self-funded prescription drug plans; and

   c)   All judges assigned to this case and any members of their immediate families.

186.    Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiff believes that members of the Class are numerous and widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many Class members to bring individual claims and join them together. The Class is readily identifiable from information and records in the possession of Defendants, third-parties, and Class members.

187.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff's claims arise out of the same course of anticompetitive conduct that gives rise to the claims of the other Class members. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants—they paid supracompetitive prices for Dexilant and its AB-rated generic and were deprived of the benefits of earlier and more robust competition from less expensive generic Dexilant as a result of Defendants' unlawful conduct alleged herein.

188.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are aligned with, and not antagonistic to, those of the other members of the Class.

CLASS ACTION COMPLAINT

189. Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation involving pharmaceutical products.

190. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entirety of each Class, thereby making overcharge damages with respect to each Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct. Questions of law and fact common to the Class include, but are not limited to:

a) Whether Defendants unlawfully maintained and continue to maintain monopoly power through all or part of their anticompetitive scheme;

b) To the extent procompetitive justifications exist, whether there were less restrictive means of achieving them;

c) Whether direct proof of Defendants' monopoly power is available and, if so, whether it is sufficient to prove Defendants' monopoly power without the need to define the relevant market;

d) Whether Defendants' scheme, in whole or in part, has substantially affected intrastate and/or interstate commerce;

e) Whether Defendants' unlawful agreements, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class;

f) Whether Defendants conspired to delay generic entry and restrict competition for Dexilant;

g) Whether, pursuant to the agreement, Takeda's promise not to compete against TWi's generic product constituted (1) a large and unexplained payment and (2) a market allocation;

h) Whether Defendants' unlawful conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Dexilant and, thereafter, a restriction in competition;

i) Determination of a reasonable estimate of the delay Defendants' unlawful conduct caused; and

j) The quantum of overcharges paid by the Class in the aggregate.

191.     Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would entail. The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress on claims that could not be practicably pursued individually, substantially outweigh the potential difficulties in managing this class action.

192.     Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## XI.     CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT

193.     A cause of action accrued for Plaintiff and Class members each time the Defendants sold a brand or generic Dexilant product at a supracompetitive price made possible by their anticompetitive conduct. And each sale by Defendants of a product at a supracompetitive price constituted another overt act in furtherance of their anticompetitive scheme. Accordingly, Plaintiff is entitled to recover damages on all sales that Defendants made to Plaintiff and Class members at supracompetitive prices within four years of the filing of this lawsuit.

194.     Due to Defendants' fraudulent concealment of their unlawful conduct, however, Plaintiff and members of the class are entitled to recover damages reaching back beyond four years of the filing of this complaint.

195.     Defendants' scheme was self-concealing, and Defendants also employed deceptive tactics and techniques to avoid detection of, and to affirmatively conceal, their contract, combination, conspiracy and scheme. For example, TWi's press release regarding the settlement made no mention of the $9.5 million payment it received from Takeda and did not disclose any information regarding Takeda's agreement not to launch a competing AG. Defendants affirmatively chose not to publicly disclose critical and material details of their Agreement to conceal the agreement's numerous anticompetitive features.

196.     It was not until TWi actually launched its AG product in January 2022—and Takeda chose not to launch its AG—that the nature and terms of Defendants' Agreement was revealed, and that

Plaintiff's cause of action would have arisen as all predicate acts of the unlawful agreement were in effect.

197.    Plaintiff had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme and conspiracy through the exercise of due diligence more than four years before the filing of this complaint.

198.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and Class members' claims have been tolled.

## XII.    CLAIMS FOR RELIEF

### COUNT ONE – CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW (AGAINST TAKEDA AND TWi)

199.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

200.    Takeda and TWi violated state antitrust and consumer protection laws by entering into an agreement in unreasonable restraint of trade in executing and adhering to the Agreement containing an unlawful reverse payment by Takeda, consisting of a payment of $9.5 million to TWi and a commitment not to launch its own authorized generic Dexilant product to compete with TWi's generic version of Dexilant, in exchange for TWi's agreement to delay the launch of its generic version of Dexilant. The agreement also constitutes an unlawful market allocation.

201.    Plaintiff and other members of the Class have been injured in their business or property by the violation of state antitrust laws. Their injury consists of having paid higher prices for brand and generic Dexilant purchased from Defendants than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the Defendants' conduct unlawful. Plaintiff, as an indirect purchaser from Takeda and TWi, is the proper entity to bring a case concerning this conduct.

202.    From the launch of brand Dexilant in 2009, Takeda possessed 100% of the relevant market—*i.e.*, the market for sales of dexlansoprazole in the United States. But for the Defendants'

wrongful conduct, as alleged herein, Takeda would have lost its 100% share of the relevant market well before it did on or around January 3, 2022.

203.    On or about April 24, 2015, Takeda and TWi entered into an agreement, a continuing illegal contract, combination, and restraint of trade under which TWi received substantial consideration in exchange for TWi's agreement to delay bringing its generic version of Dexilant to the market, the purpose and effect of which were to: (a) delay generic entry of Dexilant in order to lengthen the period in which Takeda's brand Dexilant could monopolize the market and make supracompetitive profits; and (b) ensure that, when TWi was permitted to enter the market, there would not be competition between a TWi generic and other generics for nearly a year, thereby allowing TWi to monopolize the generic market for Dexilant during that period, and allowing TWi to make supra-competitive profits.

204.    Defendants' Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

205.    Defendants' Agreement constitutes a market allocation agreement that is *per se* unlawful. Alternatively, Takeda and TWi are liable for their anticompetitive agreement under the "rule of reason" standard of the antitrust laws.

206.    There is and was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on payers and competition. Even if there were some conceivable and cognizable justification, the payment was unnecessary to achieve such a purpose.

207.    By engaging in the foregoing conduct, Defendants engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a)    Arizona Rev. Stat. §§ 44-1401, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

b)    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to Class members' purchases in California and/or purchases by California residents.

c)    C.G.S.A. §§ 35-26 and 28, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

d)    D.C. Code §§ 28-4501, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by D.C. residents.

e) Haw. Rev. Stat. §§ 480-1, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

f) 740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

g) Iowa Code § 553.1, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

h) Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

i) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to Class members' purchases in Maine and/or purchases by Maine residents.

j) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

k) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

l) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or by Minnesota residents.

m) Miss. Code Ann. §§ 75-21-1, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

n) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

o) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

p) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

q) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

r) N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents, and to the extent New York law so requires, Plaintiff hereby forgoes any penalty or minimum recovery in order to preserve the right of New York class members to recover by way of a class action.

s) N.C. Gen. Stat. §§ 75-1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

CLASS ACTION COMPLAINT

t)  N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

u)  Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

v)  P.R. Laws Ann. tit. 10 §§ 258, *et seq.*, with respect to Class members' purchases of Dexilant in Puerto Rico and/or purchases by Puerto Rico residents.

w) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

x)  S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

y)  Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

z)  Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by citizens or residents of Utah.

aa) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

bb) Wis. Stat. §§ 133.01, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

208.    Defendants engaged in unfair methods of competition or unfair and/or unconscionable conduct in violation of the state consumer protection statutes listed below.

209.    There was and is a gross disparity between the price that Plaintiff and the Class members paid for brand and generic Dexilant and the value they received. Much more affordable generic Dexilant would have been available sooner, and prices for Dexilant would have been lower, but for Defendants' unfair competition or unfair and/or unconscionable conduct.

210.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

211.    By engaging in the foregoing conduct, Defendants violated the following state consumer protection laws:

a) Alaska Stat. Ann. §§ 45.50.471, et seq., with respect to Class members' purchases of Dexilant in Alaska and/or purchases by Alaska residents.

b) Ark. Code Ann. §§ 4-88-101, et seq., with respect to Class members' purchases of Dexilant in Arkansas and/or purchases by Arkansas residents.

c) Cal. Bus. & Prof Code §§ 17200, et seq., with respect to Class members' purchases of Dexilant in California and/or purchases by California residents. Defendants engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Class members. There are no countervailing benefits to Class members, and any utility of Defendants' conduct is outweighed by the consequences to Class members. Defendants' conduct also constitutes an unlawful business practice in that it violates the Sherman Act and violates Cal. Health & Safety Code § 134002.

d) Fla. Stat. §§ 501.201, et seq., with respect to Class members' purchases of Dexilant in Florida and/or purchases by Florida residents.

e) Mass. Gen. Laws ch. 93A, §§ 1 et seq., with respect to Class members' purchases of Dexilant in Massachusetts and/or purchases by Massachusetts residents.

f) Mo. Rev. Stat. §§ 407.010, et seq., with respect to Class members' purchases of Dexilant in Missouri and/or purchases by Missouri residents.

g) Mont. Code §§ 30-14-101, et seq., with respect to Class members' purchases of Dexilant in Montana and/or purchases by Montana residents.

h) S.C. Code Ann. §§ 39-5-20, et seq., with respect to Class members' purchases in South Carolina and/or purchases by South Carolina residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce. Defendants' conduct is offensive to public policy and immoral, unethical, and oppressive.

i) Vt. Stat Ann. tit. 9, § 2453, et seq., with respect to Class members' purchases of Dexilant in Vermont and/or purchases by Vermont residents. Defendants engaged in unfair methods of competition, unfair practices, and/or deceptive practices in the conduct of trade and commerce.

212.    Plaintiff and Class members have been injured in their business or property by reason of Defendants' violations of the laws set forth above, in that they paid, and continue to pay, higher prices for brand and generic Dexilant than they would have paid but for Defendants' unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

213.    Plaintiff and Class members accordingly seek damages and multiple damages as permitted by law.

## COUNT TWO – MONOPOLIZATION UNDER STATE LAW
## (AGAINST TAKEDA)

214.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

215.    Prior to approximately January 3, 2022, Takeda possessed monopoly power in the market for dexlansoprazole.

216.    Takeda engaged in an exclusionary conduct scheme that involved a payment of $9.5 million to TWi and commitment not to launch its own authorized generic Dexilant product to compete with TWi's generic version of Dexilant in exchange for TWi's agreement to delay its market entry until 2022.

217.    The goal, purpose, and/or effect of Takeda's scheme was to maintain and extend its monopoly power with respect to Dexilant. Takeda's illegal scheme to delay the introduction of generic Dexilant allowed it to continue charging supracompetitive prices for the drug without a substantial loss of sales.

218.    During the relevant period, Plaintiff and the Class purchased substantial amounts of Dexilant indirectly from Takeda. As a result of Takeda's illegal conduct, Plaintiff and the members of the Class were compelled to pay, and did pay, inflated prices for Dexilant.

219.    Plaintiff and all Class members paid prices for Dexilant that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein because Plaintiff and Class members were deprived of the opportunity to purchase lower-priced generic Dexilant instead of the more expensive brand Dexilant.

220.    The anticompetitive consequences of Takeda's actions far outweigh any arguable procompetitive benefits. Takeda acquired and extended a monopoly through unlawful means.

221.    Takeda's scheme was, in the aggregate, an act of monopolization undertaken with the specific intent to monopolize the market for Dexilant and generic Dexilant in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1403, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to Class members' purchases in California and/or purchases by California residents.

c) C.G.S.A. §§ 35-27, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

d) D.C. Code §§ 28-4503, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by District Columbia residents.

e) Haw. Rev. Stat. §§ 480-2, 480-9, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

f) 740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

g) Iowa Code § 553.5, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

h) Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

i) Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to Class members' purchases in Maine and/or purchases by Maine residents.

j) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

k) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

l) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or purchases by Minnesota residents.

m) Miss. Code Ann. §§ 75-21-3, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

n) Neb. Rev. Stat. Ann. §§ 59-802, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

o) Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

p) N.H. Rev. Stat. Ann. §§ 356.1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

q) N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

r) N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents, and to the extent New York law so requires, Plaintiff hereby forgo any penalty or minimum recovery in order to preserve the right of New York class members to recover by way of a class action.

s) N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

t) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

u) Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

v) P.R. Laws Ann. tit. 10, §§ 260, *et seq.*, with respect to Class members' purchases of Dexilant in Puerto Rico and/or purchases by Puerto Rico residents.

w) R.I. Gen. Laws §§ 6-36-5 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

x) S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

y) Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

z) Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by Arizona residents.

aa) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

bb) Wis. Stat. §§ 133.03, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

222.    By engaging in the foregoing conduct, Takeda violated the following state consumer protection laws

a) Alaska Stat. Ann. §§ 45.50.471, et seq., with respect to Class members' purchases of Dexilant in Alaska and/or purchases by Alaska residents.

b) Ark. Code Ann. §§ 4-88-101, et seq., with respect to Class members' purchases of Dexilant in Arkansas and/or purchases by Arkansas residents.

c) Cal. Bus. & Prof Code §§ 17200, et seq., with respect to Class members' purchases of Dexilant in California and/or purchases by California residents. Takeda engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Class members. There are no countervailing benefits to Class members, and any utility of Takeda's conduct is outweighed by the consequences to Class members. Takeda's conduct also constitutes an unlawful business practice in that it violates the Sherman Act and violates Cal. Health & Safety Code § 134002.

d) Fla. Stat. §§ 501.201, et seq., with respect to Class members' purchases of Dexilant in Florida and/or purchases by Florida residents.

e) Mass. Gen. Laws ch. 93A, §§ 1 et seq., with respect to Class members' purchases of Dexilant in Massachusetts and/or purchases by Massachusetts residents.

f) Mo. Rev. Stat. §§ 407.010, et seq., with respect to Class members' purchases of Dexilant in Missouri and/or purchases by Missouri residents.

g) Mont. Code §§ 30-14-101, et seq., with respect to Class members' purchases of Dexilant in Montana and/or purchases by Montana residents.

h) S.C. Code Ann. §§ 39-5-20, et seq., with respect to Class members' purchases in South Carolina and/or purchases by South Carolina residents. Takeda engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce. Takeda's conduct is offensive to public policy and immoral, unethical, and oppressive.

i) Vt. Stat Ann. tit. 9, § 2453, et seq., with respect to Class members' purchases of Dexilant in Vermont and/or purchases by Vermont residents. Takeda engaged in unfair methods of competition, unfair practices, and/or deceptive practices in the conduct of trade and commerce.

223. Plaintiff and Class members have been injured in their business or property by reason of Takeda's violations of the laws set forth above, in that they paid higher prices for brand Dexilant than they would have paid but for Takeda's unlawful conduct. These injuries are the type that the above laws were designed to prevent, and flow from that which makes Takeda's conduct unlawful.

224. Plaintiff and Class members accordingly seek damages and multiple damages as permitted by law.

## XIII.  DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the proposed class, respectfully demands that this Court:

A.     Determine that this action may be maintained as a class action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as representatives of the Class;

B.     Enter joint and several judgments against Defendants and in favor of Plaintiff and the proposed Class;

C.     Award the Class damages (*i.e.*, three times overcharges after statutory trebling) in an amount to be determined at trial;

D.     Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

E.     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XIV.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

Dated: April 14, 2025

/s/ *Dena C. Sharp*
Dena C. Sharp (SBN 245869)
Scott Grzenczyk (SBN 279309)
Kyle Quackenbush (SBN 322401)
Jordan N. Isern (SBN 343159)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
kquackenbush@girardsharp.com
jisern@girardsharp.com

Peter Safirstein (*pro hac vice* forthcoming)
**SAFIRSTEIN LAW LLC**
45 N. Broad Street, Suite 100

Ridgewood, NJ  07450
Telephone: (917) 952-9458
psafirstein@safirsteinlaw.com

Thomas M. Sobol (*pro hac vice* forthcoming)
Gregory T. Arnold (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 475-1954
tom@hbsslaw.com
grega@hbsslaw.com

Attorneys for Plaintiff and the Proposed Class

CLASS ACTION COMPLAINT